**SO ORDERED.**

**SIGNED this 13 day of June, 2011.**



_____
               **ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| THE BLUFFS, LLC, | ) | Case No. 09-11978 |
| Debtor. | ) | Chapter 11 |
| | ) | |
| COREFIRST BANK & TRUST, | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 10-5263 |
| FIRST MANAGEMENT, INC.; | ) | |
| THE BLUFFS, LLC; ALAN E MEYER; | ) | |
| JOHN R. PRATT; and | ) | |
| DOVETAIL BUILDERS 2, L.L.C.; | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

-1-

On March 22, 2011, the Court tried CoreFirst Bank and Trust's (CFB) complaint to determine the secured status of the mechanic's lien filed by defendant First Management, Inc. (FMI) against the real estate that comprises The Bluffs.[1]  CFB challenges the priority, validity, and amount of the lien.[2]  After carefully considering the evidence and the law, the Court is prepared to rule.

### *Findings of Fact* [3]

FMI served as general contractor for the construction of The Bluffs over a three-year period beginning in December, 2005, and ending in May of 2009.  FMI is owned by Douglas Compton.  The Bluffs is owned by debtor The Bluffs, L.L.C., the members of which are JC Investments, L.L.C. which owns 50 percent, David Christie, who owns 25 percent and Alexander Glenn who owns the remaining 25 percent.  Compton holds an eighty percent equity interest in JC Investments, effectively giving him a 40 per cent equity in the project.  The complex, located in Junction City, was erected in two phases (Phase 1A and 1B), each designed to operate as a stand-alone apartment complex.  FMI was the general contractor for both phases and First National Bank of Kansas (FNBK) was the lead construction lender.  During the pendency of this bankruptcy case, FNBK assigned its notes and mortgages to CFB.

To finance the construction of the first phase (Phase 1A), FNBK loaned debtor $23.4 million

---

[1] Plaintiff CFB appeared by its attorney Patrick B. Hughes.  Defendant FMI appeared by its counsel Terrence J. Campbell.  Kenneth N. Hickox, Jr. appeared for the Dovetail parties, who also challenge FMI's mechanic's lien.

[2] This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) over which this Court has subject matter jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(1) and to which the parties stipulate.

[3] The Court notes that some of its findings of fact derive from the parties' stipulations contained in the final Pretrial Order filed March 17, 2011.  *See* Dkt. 50, pp. 4-7.

secured by a mortgage that covered all of the real estate and improvements.[4] This mortgage covers the following described real estate: "All of Blocks One (1) and Two (2), The Bluffs Addition to Junction City, Geary County, Kansas."[5] The first mortgage was filed on August 3, 2006 with the Geary County Register of Deeds and that lien primes all other lien claims in the case. The second phase (Phase 1B) was also financed by FNBK for $20 million and that loan was secured by a second mortgage that was recorded on August 29, 2007.[6] This mortgage covered the following-described real estate: "Lots One(1) and Two(2), Block One (1); and Lot One (1), Block Two (2), The Bluffs Addition to Junction City, Kansas."[7] CFB made an additional $4.0 million loan that was secured by a mortgage recorded on September 14, 2007. This mortgage described the real estate the same as the second mortgage granted to FNBK.[8] The FNBK loans and mortgages were modified by an agreement that was recorded on February 15, 2008. According to the testimony and plat submitted at trial, Phase 1A was built on Block 1, Lot 1 and Phase 1B was built on Block 1, Lot 2. Blocks 2 and 3 of The Bluffs Addition are undeveloped land.

In May of 2009, the project architect certified FMI's final application for payment on Phase 1B in the amount of $1.192 million. On May 27, 2009, at the urging of David Christie, FMI filed its mechanic's lien with the Geary County Clerk of Court that is the subject of this adversary

---

[4] Debtor executed a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated July 31, 2006.

[5] Ex. 102.

[6] As with the first mortgage, debtor executed a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing and a UCC-1 Financing Statement in conjunction with the second mortgage.

[7] Ex. 104.

[8] Ex. 107.

-3-

proceeding.[9] Christie urged FMI to action after a $9 million jury verdict was returned in favor of the Dovetail parties against him and the debtor on or about May 22, 2009. The mechanic's lien claimed that The Bluffs owed FMI $1.642 million. In this lien statement, FMI claimed a lien upon Block 1, Lots 1 and 2; Block 2, Lot 1; and Block 3, Lot 1 of The Bluffs Addition in Junction City, Geary County, Kansas. On June 4, 2009, after realizing that the debtor had significantly paid down FMI's claim, FMI filed an amended lien statement claiming only $873,295, purportedly the unpaid balance of the Phase 1B contract fixed sum.[10]

FNBK filed a foreclosure case in Geary County District Court on June 11, 2009, naming FMI as a defendant. The debtor commenced its chapter 11 case here on June 25. FMI filed a timely proof of claim in debtor's bankruptcy on November 10, 2009 in the amount of $873,295.69 and asserted that it was secured by the May 27, 2009 mechanic's lien filing. FNBK assigned its notes and mortgages to CFB who recorded the assignment on December 8, 2009. CFB is the owner and holder of all three above-described mortgage liens.

According to the testimony at trial, the debtor and FMI executed a separate construction contract for each phase, each on AIA Form A101-1997 "stipulated sum" contracts. A copy of the Phase 1A contract as signed by the parties was introduced at trial.[11] This contract was executed as of February 1, 2006. The work was to be substantially completed by March 16, 2007 for a stipulated sum of $31.269 million. No copy of the actual executed Phase 1B contract was offered at trial. Instead, FMI offered a re-printed contract that appears to have been generated on June 16, 2009

---

[9] Ex. FMI-J.

[10] Ex. FMI-K.

[11] Ex. FMI-A.

-4-

using FMI's AIA software.[12] That agreement was to be effective as of July 1, 2007 and recited a stipulated sum of $22.977 million. Although the reprinted contract states that the work is to commence in "January 2009," all of FMI's witnesses testified that the work began in the summer of 2007 if not sooner. The Court concludes that January 2009 was the intended substantial completion date. The original cost of the work was stated as $22.919 million on a pay application made by FMI in August of 2007. The cost of the work was later amended upward to $22.977 million although no change orders or amendments were offered in evidence. Even in the absence of a copy of the executed second contract, the Court concludes that one existed because it is highly unlikely that FNBK would have closed and funded the second phase loan without the debtor exhibiting a construction contract.

The work on Phase 1A was completed by July 1, 2007 and, as FMI's construction manager Robert Green testified, work began on Phase 1B shortly thereafter.[13] According to the FMI payment applications in evidence, FMI paid an engineer for services in connection with Phase 1B on July 3, 2007.[14] The Court finds that the earliest date that services were provided in connection with the second phase was July 3, 2007. FMI claims that it moved rock from the site of Phase 1B, Block 1,

---

[12] Ex. FMI-B. The AIA [**A**merican **I**nstitute of **A**rchitects] uniform contracts are produced using software that generates the actual document and applies a date-stamp to every page. When FMI could not locate a signed version of the Phase 1B contract, it re-printed what was offered in court.

[13] The Phase 1A contract has been paid in full and no lien is claimed for Phase 1A. The Court notes that after "completion" of Phase 1A, hydrants were installed on Phase 1A. This work was omitted from the Phase 1A contract and was not part of the Phase 1B contract either.

[14] Ex. FMI-C.

Lot 2, to sites on Block 2 and that it stripped topsoil from lots on Block 2 to use in Phase 1B.[15] That work forms the basis of FMI's lien claim as to all of the Bluffs property. Phase 1B's apartments are set on Block1, Lot 2 and the parties have stipulated that this tract and improvements are worth more than the amount remaining due on the second mortgages and the lien. Therefore, it is unnecessary to make findings concerning whether FMI furnished goods or services on lands other than Block 1, Lot 2.

Mr. Compton executed both the lien and amended lien statements.[16] He testified that the statements were drafted by an attorney, Todd Thompson, Esq. at the behest of David Christie. The first lien statement claimed a lien in the entirety of the Bluffs property to secure repayment of $1.642 million. In it, FMI claimed that its services were last furnished on May 26, 2009. Compton signed in his capacity as president of FMI. As KAN. STAT. ANN. § 60-1102(a) requires, the lien statement contained Compton's verification wherein he stated that after being sworn and upon his oath, he was the president of FMI, he was authorized to sign the statement, he had read it and knew its contents, and that matters contained in the statement were true. He testified that he reviewed the contents of the statement before he signed it, but that he did not track from day to day all of the activities of the company in connection with the Bluffs. Moreover, he advised that every division of FMI keeps it own records and that he could not know all the details. On cross examination, however, Mr. Compton stated that he only "believed" the contents to be true, that he did not know it to be true, and that he relied on the contents of FMI's records as well as the assistance of others

---

[15] *See* Ex. FMI-F, the final plat for The Bluffs Addition. The yellow line shown on the plat separates Phase 1A and Phase 1B construction on Block 1. Block 2 and Block 3 consist of undeveloped land.

[16] *See* Ex. 108 (Ex. FMI-J) and FMI-K.

-6-

to form that belief.

Attached to the original statement are copies of a series of invoices and two internally generated documents called "Draw Statements."[17] The invoices include category descriptions of work done by FMI's various divisions as well as work done by third party subcontractors but paid for by FMI. Both the invoices and the statements are internal documents. It is somewhat difficult to match up the work on the invoices with the items and amounts on the draw statements. For instance, invoice 25625 contains a reference to "Fire Sprinkler System" for which a charge of $21,507 is assessed. The draw statement reflects a payment in that amount to American Fire Sprinkler Corp. but does not reference a "fire sprinkler" category.[18] There is no way to match up most of the charges on 25625 without matching the payment amounts (as opposed to associating activities with vendors or categories of work). Only with respect to the categories of work done by FMI's various internal divisions can one readily ascertain the content of the charges "summarized" on the draw statement. Nothing in the lien statement actually "explains" this associative process–the Court understood it only after hearing the testimony of Mr. Compton and Ms. Abrahamson, FMI's controller.[19] Complicating understanding the original statement is the fact that it contains duplicate copies of the invoices claimed on the April draw statement.[20]

The lien statement also contains copies of invoices that are "summarized" on a document

---

[17] The draw statements cover the months of April and May, 2009. *See* Ex. 108, pp. 28-29 and 37-38.

[18] *See* Ex. 108, pp. 4, 16, 28.

[19] The Court looks at many bills and invoices in the course of its work. The manner of associating charges to the summary line items here was anything but intuitive.

[20] *See* Ex. 108, pp. 4, 16 (duplicates of invoice no. 25625)

-7-

called the May '09 Draw Sheet. This group of papers suffers from the same shortcomings noted with respect to the April '09 Draw Sheet and corresponding invoices. The April draw sheet totals $449,752.73. The May draw sheet contains a reference "bill out balance of contract" in the amount of $873,295 that, when added to the other charges on the invoices it supposedly covers, results in a total charge of $1,192,464.27. The "bill out balance" is not otherwise described. Nor does the lien statement contain a copy of the Phase 1B contract, a statement of the stipulated contract sum less payments applied, or even a running account balance. In fact, the face of the lien statements make no reference whatsoever to Phase 1B. One cannot deduce from the lien statement what remains to be paid without considerable effort.

Immediately after filing the first statement, FMI ascertained that it had received two draws that reduced its amount due to $873,295. On June 4, Compton executed an amended statement that reported the payments' receipt and reduced the amount claimed to $873,295. As supporting detail for this amendment, FMI attached a further invoice that reflected the amount of the April and May draws, receipts of $768,921, and showed the remaining balance due. Ms. Abrahamson explained that FMI received three payments, one before the first lien was filed, and two shortly afterward.[21] The sources of the payments were funds of the debtor and funds contributed by the members of the Bluffs. Notably, she also testified that all of the charges for the described services (lumber,

---

[21] These transactions or payments that reduce the amount remaining unpaid as testified to by Ms. Abrahamson are not reflected on the invoice she generated June 2, 2009 to support the amended lien statement amount. The dates of the payments are not shown and, in the body of the lien statement itself, FMI represents that the payments occurred after the filing of the original lien statement. In short, the supporting invoice attached to the amended lien statement does not reflect Ms. Abrahamson's explanation.

-8-

landscaping, plumbing, etc.) listed on the two lien statements had been paid.[22] Only the "bill out balance" amount remained unpaid as of June 4, 2009. Nothing on the amended lien statement showed the Phase 1B contract sum with monthly progress payments made on the project to arrive at the unpaid balance of the Phase 1B contract. The amended lien statement made no reference to the Phase 1B contract. Other than the summary invoice, no other documentation was attached to the amended lien statement.

When the debtor closed the Phase 1B loan in August of 2007, David Christie signed an "Owner's Affidavit" wherein the debtor stated to Lawyers Title Insurance Company that there were no unpaid contractors or claimants in connection with the Bluffs project.[23] No lien waiver documents were attached to this affidavit. In an e-mail string between Lawyers Title Insurance Company and FMI in February of 2008, FMI represented to Lawyers Title that no subcontractor, except for Larkin, had started work on Phase 1B before August 29, 2007, the date of filing of FNBK's second mortgage on Phase 1B.[24] On February 20, 2008, in support of a loan draw request, FMI in its capacity as contractor executed a partial "Waiver and Release of Lien" document stating that it sought $934,933 together with previous payments already received for work provided after January 25, 2008.[25] Then, on May 15, 2009, FMI in its capacity as "Owner or Owner's agent" prepared a further waiver document in support of its pay application 22 for $449,752.73 on the same

---

[22] The Court understood her testimony to mean that all of the invoices and the 2 draw statements in the original lien statement had been paid.

[23] Ex. 113.

[24] Recall that the earliest work on Phase 1B commenced on July 3, 2007 and consisted of engineering services paid for by FMI. This e-mail string obviously contradicts that fact unless "Larkin" was the engineering provider.

[25] Ex. 109.

-9-

form. This time, however, FMI also checked the "conditional release" box stating that the release is contingent upon receiving the payment and adding that it acknowledges receipt of $21,335,674 and grants the same "unconditional release" of the above referenced claims. Inserted below this paragraph is a stipulation that "<u>Final Pay App # 23 for $1,192,464.27 is unpaid.</u>" This waiver does not appear to be executed.

### *Analysis and Conclusions of Law*

#### *Kansas Mechanic's Lien Statutes*

KAN. STAT. ANN. § 60-1101 (2005) creates a lien in favor of any person furnishing labor, equipment, material, or supplies used or consumed for the improvement of real property. The lien attaches to the real property where the labor, material, or supplies are furnished. If it is properly documented and filed, a mechanic's lien is senior in priority to any other liens or encumbrances that are filed after the date the lien claimant commenced furnishing labor, equipment, material or supplies at the site of the property subject to the lien.[26]

KAN. STAT. ANN. § 60-1102(a) provides that a claimant shall file a verified statement

---

[26] The priority date of FMI's mechanic's lien is July 3, 2007, the first date that FMI paid for engineering services on Phase 1B per exhibit FMI-C. That critical date is referenced in § 60-1101, the statute giving a mechanic's lien priority over other liens and encumbrances (including a mortgage) filed after date of commencement. Thus, were FMI's mechanic's lien otherwise valid and compliant with the lien statement requirements of § 60-1102, it would have priority over any mortgages recorded after July 3, 2007. The Phase 1A mortgage, filed August 3, 2006, encumbered both Block 1 and Block 2 (Block 1 being the site of the Phase 1A and Phase 1B apartments). Thus, CFB's first mortgage has priority over FMI's mechanic's lien to the extent of the principal amount of $23.4 million. The Phase 1B mortgage, which also encumbered Lots 1 and 2 of Block 1, was recorded on August 29, 2007 and secured the $20 million Phase 1B loan. Since it was filed after the date work commenced on Phase 1B, FMI's mechanic's lien is prior to the Phase 1B mortgage as well as CFB's third mortgage recorded September 14, 2007. Of course, this order of priority matters only if FMI's mechanic's lien statement is valid and enforceable.

containing: (1) the name of the owner of the property; (2) the name and address of the claimant; (3) a description of the real property; and (4) a reasonably itemized statement and the amount of the claim. The verified statement must be filed "within four months after the date material, equipment or supplies, used or consumed was last furnished or last labor performed under the contract." In lieu of a reasonably itemized statement, the claimant may attach to the statement a copy of the written instrument evidencing the amount of the claim, such as the contract.[27] The verified statement is to be filed with the clerk of the district court of the county where the property is located. The clerk of the court then records the lien by indexing it in the general index by party names and file number.[28]

KAN. STAT. ANN. § 60-1102(a) requires the lien claimant to verify the statement. A verification is essential to creating a mechanic's lien and its purpose is to swear to the truth of the matter set forth in the lien statement.[29] It is an "affidavit attached to a statement as to the truth of the matters therein set forth."[30] The verification must be absolute, not qualified.[31] The execution

---

[27] In *Huber Co. v. DeSouza*, 32 Kan. App. 2d 614, 617, 86 P.3d 1022 (1986), the Court of Appeals held that this exception to a reasonably itemized statement is a narrow one and limited to cases where the writing contains exactly the dollar amount claimed by the lienholder.

[28] KAN. STAT. ANN. § 60-1102(b).

[29] *See D.J. Fair Lumber Co. v. Karlin,* 199 Kan. 366, 430 P.2d 222 (1967) (explaining the distinction between an acknowledgment and verification and disallowing amendment of lien statement to supply the verification); *Trane Co. v. Bakkalapulo,* 234 Kan. 348, 672 P.2d 586 (1983) (purpose of verification).

[30] *Id.* at 369. *See also, Trane Co., supra* at 352; *Ekstrom United Supply Co. v. Ash Grove Lime & Portland Cement Co.,* 194 Kan. 634, 636, 400 P.2d 707 (1965) (The verification requirement means the lien statement must be sworn to by the claimant before an officer having authority by law to administer and certify oaths.)

[31] *See Lewis v. Wanamaker Baptist Church*, 10 Kan. App. 2d 99, 102, 692 P.2d 397 (1984) (A qualified verification that states the lien statements and attached exhibits are true and correct *to best of affiant's knowledge and belief*, is insufficient.); *DaMac Drilling, Inc. v. Shoemake,* 11 Kan. App. 2d 38, 713 P.2d 480 (1986) (same as applied to oil and gas lien

-11-

of an unqualified verification implies the signer's knowledge sufficient to state the truth of the contents of the lien statement.[32]

Section 60-1105(a) provides that a claimant shall file an action to foreclose a mechanic's lien within one year from the time of filing the lien statement. Failure to timely foreclose the lien renders it unenforceable. KAN. STAT. ANN. § 60-1108 provides that "[i]f no action to foreclose or adjudicate any lien filed under the provisions of this article shall be instituted within the time provided in subsection (a) of K.S.A. 60-1105, and amendments thereto, the lien shall be considered canceled by limitation of law." Section 108(c) of the Bankruptcy Code may operate to extend the time in which the claimant must foreclose or enforce the lien.

As the party asserting a mechanic's lien, here FMI, has the burden of bringing itself clearly within the statutory provisions.[33] "The requirements for a mechanic's lien must be strictly met for the lien to come into existence. It is only after the lien has attached that the mechanic's lien provisions are liberally construed."[34]

Of the theories that underlay CFB's and the Dovetail parties' contention that FMI's mechanic's lien is invalid, only three remain.[35] First, they contend that the lien statement does not contain a reasonably itemized statement of the work performed or materials and supplies furnished.

---

statement).

[32] *J. Walters Const. Co. v. Greystone South Partnership, L.P.,* 15 Kan. App. 2d 689, 692-93, 817 P.2d 201 (1991).

[33] *Creme de la Creme (Kansas), Inc. v. R & R Int'l, Inc.*, 32 Kan.App.2d 490, 493, 85 P.3d 205, *rev. denied* 278 Kan. 844 (2004).

[34] *Id.* at 493.

[35] As noted on page 7, *supra*, the parties have abandoned their argument concerning the lienable nature of the work done on Blocks 2 and 3.

-12-

Third, they challenge Mr. Compton's verification of the lien statement because his trial testimony qualified his oath verification on the statement. They also assert that FMI waived its lien rights and that FMI failed to commence its action to foreclose the mechanic's lien within one year of filing. Because the Court concludes that the lien statement was not reasonably itemized and that the verification was qualified, the Court need not reach the balance of CFB's or Dovetail's arguments.

### *Reasonably Itemized Statement*

The validity of a lien statement is to be determined from its four corners, including the contents of attachments, and not supplemented by evidence outside its contents.[36] The degree of detail required to comply with the statute is less than precise. The Kansas Court of Appeals has said that the itemized statement required by § 60-1102(a)(4) must be "neither excessive nor insufficient in detail but which is fair and sufficient to inform the landowner of the claim and to enable him to ascertain whether the material was furnished and the charges fair."[37] In *Huber Co. v. DeSouza,* the parties' contract (on a cost-plus basis) was attached to the lien statement as the only "itemization," but the contract added no itemization to the description of the work or amount contained in the statement itself.[38] There was no statement of total charges due or credit for payments made or otherwise indicated how the claimant arrived at the amount due. The mere attachment of the contract was deemed insufficient.

The current case comes closer to meeting the "reasonably itemized" standard than *Huber*,

---

[36] *Trane Co., supra* at 352; *Huber Co. v. DeSouza*, 32 Kan. App. 2d 614, 616-17, 86 P.3d 1022 (1986).

[37] *Scott v. Strickland,* 10 Kan. App. 2d 14, 23, 691 P.2d 45 (1984) (illegible photocopies of invoices attached to lien statement were sufficient itemization where the total charge on each invoice was legible and the type of materials used in the work could be ascertained).

[38] 32 Kan. App. 2d at 616.

but falls short because without the extrinsic testimony offered by FMI through lengthy explanation at trial, the basis for the amount of the lien is almost incomprehensible. On the amended statement, FMI claims the "bill out balance" of the contract. That term or language was included in the original statement, but not explained until trial. The "bill out balance" is buried in the May Draw Statement but its whereabouts are not apparent from the face of the amended statement. Nor is the "bill out balance" supported by invoices of costs on the project. The amended statement is made even more confusing by the trial testimony that the charges set forth in the April and May Draw Statements that were attached to the original lien statement were paid and were no longer being claimed on the amended lien statement. Neither the May Draw Statement attached to the original lien statement, nor the summary invoice attached to the amended lien statement describe what the "bill out balance" is or how the amount was arrived at. Nor does either lien statement itemize the "bill out balance" to determine whether material or other lienable items were furnished and the fairness of the amount claimed.[39] FMI could have generated an invoice showing the gross stipulated contract sum of Phase 1B, less progress payments or payment applications paid, to arrive at the unpaid balance of the Phase 1B contract.[40] Or, FMI could have supplied sufficient detail by attaching the payment applications that comprised the unpaid balance and the Phase 1B contract. It did neither. The Court cannot see how an owner relying only upon the statement (and not the illuminating extrinsic testimony) could hope to determine whether "the material was furnished and the charges

---

[39] *See Scott v. Strickland, supra.*

[40] *See DaMac Drilling, Inc. v. Shoemake,* 11 Kan. App. 2d 38, 713 P.2d 480 (1986); *Holtzen v. Dunn,* 176 Kan. 206, 269 P.2d 1042 (1954). The Court notes that FMI furnished the payment information on Phase 1B during discovery and was apparently readily ascertainable. *See* Ex. 118, Interrogatory No. 10.

-14-

Case 10-05263   Doc# 56   Filed 06/13/11   Page 14 of 17

fair."[41]

Based upon the foregoing case law and review of the lien statements at issue here, the Court concludes that FMI did not provide a reasonably itemized statement. This alone suffices to render the mechanic's lien invalid and unenforceable.

*Verification*

Even were the lien property itemized, Compton's verification of it was qualified and therefore faulty. The verification he signed reads as follows:

> Douglas J. Compton, of lawful age, being first duly sworn upon his oath, deposes, states and verifies under penalties of perjury:
>
> That he is the President of First Management, Inc.; that he is authorized for and on behalf of the corporation to execute the above amended lien statement; that he has read the above and foregoing Amended Statement of Mechanic's Lien and *knows the contents thereof*; and that the matters stated therein are true.
>
> /s/ Douglas J. Compton[42]

Facially, the verification is absolute and complies with the verification requirements under Kansas law.[43] However, the validity of the verification was subject to challenge at trial.[44] Compton testified at trial that he "believed" the lien statement was true, but was could not state that he "knew"

---

[41] *See Scott v. Strickland*, *supra*, 10 Kan. App. 2d at 23.

[42] Ex. 108 (Emphasis added.).

[43] *See Star Lumber & Supply Co., Inc. v. Capital Const. Co., Inc.,* 238 Kan. 743, 751, 715 P.2d 11 (1986) (properly verified lien statement was prima facie evidence that person signing affidavit was properly sworn; fact that person could not recall the procedure precisely several years later was insufficient to overcome presumptive validity).

[44] *Id.* (The jurat is presumptive evidence that the oath was administered and so long as the jurat is unimpeached it is conclusive.); *Halsey v. Pat Reichenberger Lumber, Inc.,* 5 Kan. App. 2d 622, 621 P.2d 1-21 (1981) (verification was invalid as a matter of law where affiant testified in his deposition that he signed the lien statement outside the presence of a notary).

-15-

it was true. A verification based upon the affiant's understanding and belief is a qualified verification and insufficient.[45] While Compton did not have to have personal knowledge of every transaction comprising the lien amount, he was permitted to rely on FMI's business records for his knowledge of the contents of the lien statement if he believed those records accurate.[46] But based upon those records and that knowledge, Mr. Compton was required to state that the lien statement was unqualifiedly true. Indeed, he testified that he "did not have a clue" at the time the first statement was signed about all of the contents of the statement. In addition, the statement he signed on May 27, 2009 was patently NOT true because, as the amendment indicates, the first statement overstated by several hundred thousand dollars the extent of FMI's claim. Contrast Compton's oral contradiction and qualification of his signed verification at trial with the testimony of the signer in the *Star Lumber* case cited by FMI. There, the lien claimant's president testified that he relied on the records of the company as well as his officers and employees in swearing to the content of the lien statement. The Supreme Court concluded that when a verification is based on business records, it is sufficient where the signer testifies to his knowledge and belief in the records' accuracy.[47] While his belief is understandable given the size and scope of his affairs, Compton's qualified oath falls far short of that standard.

Because the verification is qualified, the mechanic's lien statement is unenforceable. In light of these findings, the Court need not address the parties' remaining waiver argument.

***Conclusion***

---

[45] *Lewis v. Wanamaker Baptist Church*, *supra.*

[46] *See Star Lumber, supra* at 751-52.

[47] *Id.*

-16-

FMI's mechanic's lien fails because it is not reasonably itemized to the degree required by KAN. STAT. ANN. § 60-1102. In the absence of an extrinsic explanation or a summary of the accounting for what remained of the Phase 1B contract sum to be paid, there is no way to understand from the four corners of the statement what the "bill out balance" amount of $873,295 claimed is for and whether lienable items were furnished for that amount. In addition, FMI's president impeached his verification of the lien statement, rendering it qualified at best. Kansas law requires the verification to be absolute.

Judgment is therefore entered in favor of CFB determining FMI's lien to be invalid and unenforceable. FMI is allowed an unsecured claim in the amount of $873,295.69. A Judgment on Decision shall issue this day.

# # #